Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/20/2019 09:07 AM CST

State of Nebraska, appellee, v.
Carla Montoya, appellant.

___ N.W.2d ___

Filed September 27, 2019.    No. S-18-342.

1. **Constitutional Law: Motions to Suppress: Confessions: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

2. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.

3. **Constitutional Law: Statutes: Judgments: Appeal and Error.** The constitutionality and construction of statutes are questions of law, regarding which appellate courts are obligated to reach conclusions independent of those reached by the court below.

4. **Trial: Convictions: Evidence: Appeal and Error.** An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

5. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

6. **Miranda Rights.** The warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are required only when a suspect interrogated by the police is "in custody."

7. ____. The ultimate inquiry for determining whether a person is "in custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

8. ____. The test for custody under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is to be determined based on how a reasonable person in the suspect's situation would perceive his or her circumstances. It is an objective inquiry and does not depend on the subjective views harbored by either the interrogating officer or the person being interrogated.

9. ____. The test for determining custody under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), involves two discrete inquiries: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.

10. **Constitutional Law: Confessions.** The 5th Amendment to the U.S. Constitution, along with the Due Process Clause of the 14th Amendment, prevents the use of involuntary confessions in criminal convictions.

11. **Miranda Rights.** The question of whether a custodial interrogation complies with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is distinct from the question of whether statements made during a custodial interrogation were sufficiently voluntary.

12. **Confessions: Proof.** The State has the burden to prove that a defendant's statement was voluntary and not coerced.

13. **Confessions.** Whether a defendant's statement was voluntarily given depends on the totality of the circumstances. Factors to consider include the interrogator's tactics, the details of the interrogation, and any characteristics of the accused that might cause his or her will to be easily overborne.

14. **Confessions: Police Officers and Sheriffs.** While the confession of an accused may be involuntary and inadmissible if obtained in exchange for a promise of leniency, mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or promise, does not make a subsequent confession

involuntary. In order to render a statement involuntary, any benefit offered to a defendant must be definite and must overbear his or her free will.

15. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

16. **Criminal Law: Minors: Intent.** Neb. Rev. Stat. § 28-707(1)(a) through (f) (Reissue 2016) defines the offense of child abuse. Then, § 28-707(3) through (8) classifies the level of any such offense based on two factors: the actor's state of mind when committing the offense and the degree of harm to the child resulting from the offense.

17. **Criminal Law: Minors: Intent: Proof.** To convict a defendant of the Class IB felony of knowing and intentional child abuse resulting in death under Neb. Rev. Stat. § 28-707 (Reissue 2016), the State must prove the defendant knowingly and intentionally caused or permitted the child to be abused in one or more of the ways defined in § 28-707(1), and also must prove the offense resulted in the child's death, as required by § 28-707(8). It is not necessary, however, to prove the defendant intended the abuse to result in death.

18. **Statutes.** It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

19. **Plea in Abatement: Evidence: Appeal and Error.** An error in a ruling on a plea in abatement challenging whether there was sufficient evidence to bind a case over for trial is cured by a subsequent finding at trial of guilt beyond a reasonable doubt which is supported by sufficient evidence.

20. **Criminal Law: Evidence: Appeal and Error.** When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

21. **Constitutional Law: Statutes: Standing: Proof.** Standing to challenge the constitutionality of a statute under the federal or state Constitution depends upon whether one is, or is about to be, adversely affected by the language in question. To establish standing, the contestant must show that as a consequence of the alleged unconstitutionality, the contestant is, or is about to be, deprived of a protected right.

22. **Constitutional Law: Statutes.** Courts will not decide a question concerning the constitutionality of a statute unless such question has been

raised by a litigant whose interests are adversely affected by the questioned statute.

23. **Constitutional Law: Statutes: Presumptions.** Courts will presume a statute to be constitutional and will resolve all reasonable doubts in favor of its constitutionality.

24. **Constitutional Law: Statutes: Proof.** The burden to clearly demonstrate that a statute is unconstitutional rests upon the party making the claim of unconstitutionality.

25. **Constitutional Law: Criminal Law: Statutes.** A penal statute must be construed so as to meet constitutional requirements if such can reasonably be done.

26. **Equal Protection.** The Equal Protection Clause does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.

27. ____. When a classification created by state action does not jeopardize the exercise of a fundamental right or categorize because of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.

28. **Constitutional Law: Statutes: Legislature: Intent: Appeal and Error.** Under rational basis review, an appellate court will uphold a classification created by the Legislature where it has a rational means of promoting a legitimate government interest or purpose. In other words, the difference in classification need only bear some relevance to the purpose for which the difference is made.

29. **Equal Protection: Proof.** Under the rational basis test, whether an equal protection claim challenges a statute or some other government act or decision, the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.

30. **Constitutional Law: Criminal Law: Statutes.** The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

31. **Constitutional Law: Statutes: Standing.** The test for standing to assert a vagueness challenge is the same whether the challenge asserted is facial or as applied. To assert a claim of vagueness, a defendant must not have engaged in conduct which is clearly prohibited by the questioned statute. Furthermore, a defendant cannot maintain that the statute is vague when applied to the conduct of others, because a court will not examine the vagueness of the law as it might apply to the conduct of persons not before the court.

32. **Sentences: Appeal and Error.** Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits.

33. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

34. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

35. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

36. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Madison County: James G. Kube, Judge. Affirmed.

Ronald E. Temple, of Fitzgerald, Vetter, Temple & Bartell, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.
Carla Montoya was convicted of knowing and intentional child abuse resulting in death, in violation of Neb. Rev. Stat. § 28-707(1) and (8) (Reissue 2016). She was sentenced to prison for a term of 55 to 75 years. Finding no merit to

any of her assignments of error, we affirm her conviction and sentence.

## I. FACTS

At approximately 1 a.m. on March 13, 2016, Montoya brought her 4½-year-old daughter, C.H., to the emergency room at Faith Regional Health Services (Faith Regional) in Norfolk, Nebraska. C.H. was unresponsive, tremoring, and posturing, and she had bruising on her body. A CT scan revealed bilateral bleeding between the brain and the skull. C.H. was "life-flighted" to Children's Hospital in Omaha, Nebraska, where she subsequently died from her injuries. The cause of death was blunt force trauma to the head.

### 1. Police Investigation

Shortly after C.H. was brought to the emergency room, staff there contacted police to report possible child abuse. The police conducted a series of three interviews with Montoya; two of those interviews occurred the same day that C.H. was taken to Faith Regional, and the third interview occurred the next day.

### (a) First Interview

When police arrived at Faith Regional, an officer asked to speak with Montoya in a private area. They proceeded to a family waiting room where the officer questioned Montoya about how C.H. had sustained her injuries. This interview, which was recorded on the officer's body microphone, was suppressed by the trial court. That suppression ruling has not been challenged on appeal.

### (b) Second Interview

Shortly after the first interview ended, the lead investigator, Josh Bauermeister, arrived at Faith Regional. After C.H. was life-flighted to Children's Hospital in Omaha, Bauermeister was introduced to Montoya and told her he wanted "to find out a little bit about what happened." He asked whether Montoya would allow police to search and photograph her apartment

and whether she would give a recorded interview at the police station. Montoya agreed to both requests. Montoya's boyfriend then took officers to the apartment, and Montoya—who did not have a car available—rode with Bauermeister to the police station in the front seat of his unmarked patrol car.

The recorded interview occurred in an interview room at the police station, and lasted about 1 hour. At the beginning of the interview, Bauermeister told Montoya that she was not under arrest, that she did not have to speak with him, and that she could leave at any time. Bauermeister also explained how to leave the police station from the interview room.

During the interview, Montoya explained that around noon on March 12, 2016, she became frustrated that C.H. would not stay in her bed and would not stop crying, so she squeezed C.H.'s torso hard enough to leave marks and then threw C.H. onto her bed three times. Montoya said that C.H. struck her head on the wall the third time she was thrown. After that, C.H. fell asleep around 1 p.m. and slept until around 4 p.m., when she woke briefly before falling asleep again. Around 9 p.m., C.H. began to vomit. Montoya put C.H. into the bathtub to wash her off, but C.H. would not stand; Montoya described C.H.'s body as "Jell-O." Montoya said that when she turned on the cold water, C.H. became responsive and was able to answer questions. Montoya asked C.H. whether her head hurt, and C.H. answered yes. Montoya also asked whether C.H. wanted ice cream, and C.H. again answered yes.

Montoya and her boyfriend put C.H. in the car to get some ice cream. They proceeded to drive several places with C.H., including to Montoya's mother's house, a grocery store, a discount department store, and a fast-food restaurant. When they returned home, C.H. was unresponsive. Montoya called a friend who convinced her to take C.H. to the hospital.

At the end of the recorded interview, Bauermeister asked Montoya to write a statement summarizing her interview, and she complied. When Montoya finished writing out her three-page statement, she left the police station.

Bauermeister subsequently obtained an arrest warrant, and Montoya was arrested at Children's Hospital in Omaha on March 14, 2016. She was transported to the downtown Omaha police station, where she was interviewed a third time.

### (c) Third Interview

Montoya's third interview was conducted by Bauermeister on March 14, 2016, at 1:30 p.m. and lasted 1¼ hours. Before questioning Montoya, Bauermeister spoke about the importance of telling the truth during the interview, saying, "Whatever you do today though, don't lie about it, because if you lie about anything or fail to tell me anything, it's going to look really bad for you when you go to court." Bauermeister also advised Montoya of her rights under *Miranda v. Arizona*[1] before questioning her. Throughout the interview, Bauermeister continued to emphasize the importance of being truthful. His statements in that regard are addressed more fully in our analysis of Montoya's assignment of error relating to the third interview.

During the third interview, Montoya admitted she slammed C.H. into the wall as hard as she could and held her there. Montoya explained that she also pushed C.H. against the wall three or four times to stop her from getting away, all while screaming and yelling at her to "shut up" and to stop crying. Montoya said that C.H.'s head slammed into the wall and that Montoya pressed C.H. so hard against the wall that she worried it would break her ribs. Additionally, Montoya said that when she threw C.H. onto her bed, she did it forcefully and C.H. hit her head on the bedframe both the first and last time she was thrown. Montoya said she did not take C.H. to the hospital sooner, because she was afraid what people might think about the bruises and because she was in denial about hurting C.H. and was hoping she might recover.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Toward the end of the third interview, Bauermeister asked Montoya to write out what happened, and she complied. Her written statement tracked generally with her statements to police during the interview.

C.H. died from her injuries on March 20, 2016, after which the State charged Montoya with knowing and intentional child abuse resulting in death, a Class IB felony.[2]

## 2. Pretrial Proceedings

### (a) Motions to Suppress

Montoya moved to suppress all of her oral and written statements to police. She claimed she was in custody during all three interviews and argued her statements should be suppressed, because (1) in the first and second interviews, she was not advised of her *Miranda* rights, and (2) in the second and third interviews her will was overborne by coercive interrogation tactics.

After a hearing, the trial court sustained in part and denied in part Montoya's motion to suppress. Regarding the first interview, the trial court sustained the motion to suppress, finding Montoya was in custody during police questioning at Faith Regional and should have received the *Miranda* advisement. As stated, the State has not challenged the suppression of the first interview.

Regarding the second interview, the court found that under the totality of the circumstances, Montoya was not in custody and her statements were made freely and voluntarily. Regarding the third interview, the trial court found that the officer's interrogation tactics did not amount to improper threats, inducements, or lies and that Montoya's confession was freely and voluntarily made. The court thus overruled Montoya's motion to suppress as it regarded both the second and third interviews.

---

[2] § 28-707(1) and (8).

### (b) Plea in Abatement

After the court ruled on Montoya's motion to suppress, Montoya was permitted to withdraw her plea of not guilty in order to file a plea in abatement challenging the sufficiency of the evidence to bind the case over to district court. In support of her plea in abatement, Montoya argued the State had not offered any evidence that she intended to kill C.H., and she suggested that a finding of guilt under § 28-707 requires the State to prove the defendant had specific intent to cause the resulting harm. The trial court rejected Montoya's interpretation of § 28-707, reasoning it was inconsistent with the plain language of the statute and with settled precedent from both this court[3] and the Nebraska Court of Appeals.[4] The trial court found the evidence offered at the preliminary hearing was sufficient to establish probable cause that Montoya committed the crime of intentional child abuse resulting in death under § 28-707, and it overruled the plea in abatement.

### (c) Motion to Quash

Once the plea in abatement was overruled, Montoya filed a motion to quash the information. In support of the motion, Montoya argued that unless § 28-707 was construed to require proof that she intended to cause the resulting harm to the child, the statute would be unconstitutional, both facially and as applied. The trial court overruled the motion to quash, rejecting all of Montoya's facial constitutional challenges and reserving ruling on the as-applied challenges.

### 3. BENCH TRIAL AND SENTENCING

After Montoya reentered a plea of not guilty, she waived her right to a jury and a bench trial was held. Montoya renewed her motion to suppress and her constitutional challenges to § 28-707, and the court overruled them. In an order entered

---

[3] See *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

[4] See *State v. Parks*, 5 Neb. App. 814, 565 N.W.2d 734 (1997), *reversed on other grounds* 253 Neb. 939, 573 N.W.2d 453 (1998).

February 1, 2018, the district court found beyond a reasonable doubt that

> on March 12, 2016, [Montoya] knowingly and intentionally placed her minor child, [C.H.], in a situation that endangered that child's life, and that [Montoya] did knowingly and intentionally cruelly punish this child, which ultimately caused and resulted in the death of [C.H.] approximately one week later, on March 20, 2016. Additionally, the Court specifically finds that this offense was not committed negligently, nor did [Montoya] act recklessly. Her actions directed against the child . . . were intentional.

Montoya was found guilty of intentional child abuse resulting in death, a Class IB felony. She was sentenced to an indeterminate prison term of 55 to 75 years. Montoya filed this timely appeal, which we moved to our docket.

## II. ASSIGNMENTS OF ERROR

Montoya assigns, consolidated and restated, that the trial court erred in (1) overruling her motion to suppress, (2) overruling her plea in abatement, (3) overruling her motion to quash and rejecting her constitutional challenges, (4) finding her guilty of intentional child abuse resulting in death, and (5) imposing an excessive sentence.

## III. STANDARD OF REVIEW

[1] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda*,[5] an appellate court applies a two-part standard of review.[6] Regarding historical facts, an appellate court reviews the trial court's findings for clear error.[7] Whether those facts meet constitutional standards, however, is

---

[5] *Miranda, supra* note 1.

[6] *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017).

[7] *Id.*

a question of law, which an appellate court reviews independently of the trial court's determination.[8]

[2] Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.[9]

[3] The constitutionality and construction of statutes are questions of law, regarding which appellate courts are obligated to reach conclusions independent of those reached by the court below.[10]

[4] An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction.[11] In making this determination, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition.[12] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[13]

[5] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[14]

## IV. ANALYSIS

### 1. Motion to Suppress

Montoya argues the trial court erred in overruling her motion to suppress statements made in the second and third

---

[8] *Id.*

[9] *State v. Kennedy*, 299 Neb. 362, 908 N.W.2d 69 (2018).

[10] See *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012).

[11] *State v. Schuller*, 287 Neb. 500, 843 N.W.2d 626 (2014).

[12] *Id.*

[13] *Id.*

[14] *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

police interviews. Regarding the second interview, Montoya claims her statements should have been suppressed because police questioned her without first giving her the *Miranda* advisement. Regarding both the second and third interviews, Montoya claims her will was overborne by coercive police tactics and argues her statements should have been suppressed as involuntary. We address each argument in turn.

### (a) *Miranda* Advisement

[6] In *Miranda*, the U.S. Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."[15] To combat against these pressures and protect the privilege against self-incrimination, *Miranda* announced a set of prophylactic warnings that law enforcement officers must give before interrogating someone who is in custody. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[16] These warnings are considered "prerequisites to the admissibility of any statement made by a defendant" during custodial interrogation.[17] But *Miranda* warnings are required only when a suspect interrogated by the police is "in custody."[18] And the fact that a suspect is questioned by police at

---

[15] *Miranda, supra* note 1, 384 U.S. at 467.

[16] *Id.*, 384 U.S. at 444. Accord, *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019); *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014).

[17] *Miranda, supra* note 1, 384 U.S. at 476.

[18] *Thompson v. Keohane*, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995).

the station house does not necessarily render the questioning custodial.[19]

[7-9] Both the U.S. Supreme Court and this court have emphasized that the ultimate inquiry for determining whether a person is "in custody" for purposes of *Miranda* "'is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"[20] The *Miranda* custody test is to "be determined based on how a reasonable person in the suspect's situation would perceive his [or her] circumstances."[21] It is an objective inquiry and does not depend on the subjective views harbored by either the interrogating officer or the person being interrogated.[22] The U.S. Supreme Court has described the *Miranda* custody test as involving two discrete inquiries: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'"[23]

In *State v. Rogers*,[24] we observed that a "large body of case law" had developed to assist courts in identifying which circumstances may be most relevant to the *Miranda* custody inquiry. *Rogers* mentioned eight such circumstances, including: (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to leave;

---

[19] See, e.g., *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977).

[20] *Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (quoting *Beheler, supra* note 19). Accord *In re Interest of Tyler F.*, 276 Neb. 527, 755 N.W.2d 360 (2008).

[21] *Yarborough, supra* note 20, 541 U.S. at 662. Accord *In re Interest of Tyler F., supra* note 20.

[22] *Yarborough, supra* note 20.

[23] *Id.*, 541 U.S. at 663 (quoting *Thompson, supra* note 18).

[24] *State v. Rogers*, 277 Neb. 37, 57, 760 N.W.2d 35, 54 (2009).

(2) whether the contact with the police was initiated by them or by the person interrogated and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used other interrogation techniques to pressure the suspect; and (8) whether the police manifested to the defendant a belief that the defendant was culpable and that they had the evidence to prove it.[25]

In *Rogers* and several other cases analyzing custody under *Miranda*,[26] we also discussed the six "indicia of custody" outlined by the Eighth Circuit Court of Appeals in *U.S. v. Axsom*.[27] The *Axsom* indicia include: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong-arm tactics or deceptive stratagems were used during questioning; (5) whether the atmosphere of the questioning was police dominated; and (6) whether the suspect was placed under arrest at the termination of the proceeding.[28] The first three *Axsom*

---

[25] *Rogers, supra* note 24.

[26] See, *id.*; *State v. McKinney*, 273 Neb. 346, 730 N.W.2d 74 (2007); *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *abrogated on other grounds, Rogers, supra* note 24.

[27] *U.S. v. Axsom*, 289 F.3d 496 (8th Cir. 2002).

[28] *Id.*

indicia are factors which, if present, tend to weigh against a finding of custody, and the last three weigh in favor of a finding of custody.[29] However, *Axsom* emphasized that the indicia were intended to be representative and not exclusive; a finding of custody does not require the factual circumstances of a case to present all six indicia.[30]

In the instant case, Montoya was not given the *Miranda* advisement before the second interrogation. In analyzing whether Montoya was in custody during that interrogation, the district court recited the governing principles outlined above, and it expressly analyzed each of the six *Axsom* indicia before concluding, based on a review of all the circumstances surrounding the interrogation, that Montoya was not in custody. On appeal, Montoya argues the district court erred when it analyzed custody using the *Axsom* indicia without also expressly addressing the eight circumstances we identified in *Rogers*. She contends this is grounds for reversal. She is incorrect.

Both *Rogers* and *Axsom* offer guidance to courts when analyzing the circumstances surrounding an interrogation to determine whether a reasonable person in those circumstances would have believed they were in custody, and both cases were decided at a time when the U.S. Supreme Court had not expressly identified relevant factors to consider in making the *Miranda* custody determination. But neither *Rogers* nor *Axsom* purported to develop an exclusive test which must be applied in every case, and we expressly reject Montoya's suggestion to the contrary.

For the sake of completeness, we note that in 2012, the U.S. Supreme Court, in *Howes v. Fields*,[31] also identified several "[r]elevant factors" for courts to consider when examining the objective circumstances to determine whether a reasonable

---

[29] *Id.*

[30] *Id.*

[31] *Howes v. Fields*, 565 U.S. 499, 509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012).

person would have felt he or she was not at liberty to terminate the interrogation and leave. These factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.[32]

While many appellate courts have developed factors to help guide the *Miranda* custody determination,[33] neither the U.S. Supreme Court nor this court has developed a single set of factors that courts are required to apply in every case. So while the factors identified in *Howes*, the circumstances summarized in *Rogers,* and the indicia outlined in *Axsom* all provide guidance, none are meant to be applied mechanically or exclusively to determine whether a suspect is in custody for purposes of *Miranda*. We reject Montoya's argument that the district court erred in not expressly considering each circumstance referenced in *Rogers*.

Here, the district court properly considered the relevant circumstances surrounding Montoya's interrogation and made specific factual findings which we review for clear error.[34] Among others, the court found that Montoya voluntarily agreed to ride with police to the station because she did not have a car available. Once Montoya was in the interview room, she was expressly told that she was not in custody, that she was free to leave at any time, that she was not under arrest, and that she would be walking out of the police station after the interview. Nothing about the officer's subsequent questioning or conduct nullified these statements. In addition, Montoya was instructed by police how to leave the police station from the interview room, and during questioning, police did not

---

[32] *Id.*

[33] See, e.g., *U.S. v. Jones*, 523 F.3d 1235 (10th Cir. 2008); *U.S. v. Swanson*, 341 F.3d 524 (6th Cir. 2003); *U.S. v. Hayden*, 260 F.3d 1062 (9th Cir. 2001); *U.S. v. Fike*, 82 F.3d 1315 (5th Cir. 1996), *overruled on other grounds, U.S. v. Brown*, 161 F.3d 256 (5th Cir. 1998).

[34] See *Clifton, supra* note 6.

position themselves in a way to prevent her from leaving if she wished. Montoya was not handcuffed at any point, and her freedom of movement was unrestrained. All of these findings pertain to the circumstances surrounding the interrogation, and all are supported by the record.

Based on these findings, the district court concluded that Montoya voluntarily agreed to an interview at the police station and that a reasonable person in her position would "not have necessarily felt compelled to do so." This is a conclusion of law which an appellate court reviews independently.[35] Having done so, we conclude that a reasonable person in Montoya's position would not have felt he or she was not at liberty to terminate the interrogation and leave.[36] Because Montoya was not "in custody" during the second interview, no *Miranda* advisement was required prior to questioning. The district court properly denied her motion to suppress to the extent it was based on the absence of a *Miranda* advisement.

### (b) Voluntariness of Montoya's Statements

With respect to both the second and third interviews, Montoya argues that her statements should have been suppressed, because they were not voluntarily made and her will was overborne by coercive police tactics.

[10,11] The 5th Amendment to the U.S. Constitution, applicable to state governments by incorporation through the 14th Amendment, protects against compelled self-incrimination by providing that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself . . . ."[37] This amendment, along with the Due Process Clause of the 14th Amendment, prevents the use of involuntary confessions in

---

[35] *Id.*

[36] Accord, *Beheler, supra* note 19; *Mathiason, supra* note 19.

[37] U.S. Const. amend. V; *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018).

criminal convictions.[38] Although the *Miranda* rule and the requirement that confessions be made voluntarily both arise out of the Fifth Amendment, the question of whether a custodial interrogation complies with *Miranda* is distinct from the question of whether statements made during a custodial interrogation were sufficiently voluntary.[39]

[12,13] The State has the burden to prove that a defendant's statement was voluntary and not coerced.[40] Whether a statement was voluntarily given depends on the totality of the circumstances.[41] Factors to consider include the interrogator's tactics, the details of the interrogation, and any characteristics of the accused that might cause his or her will to be easily overborne.[42] While the circumstances surrounding the statement and the characteristics of the individual defendant at the time of the statement are potentially material considerations, coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment.[43] With this in mind, we consider Montoya's contention that her confessions during the second and third interviews were not voluntary.

### (i) Second Interview

The district court's order overruling Montoya's motion to suppress made several factual findings that are relevant to the voluntariness inquiry. It found that no "strong-arm tactics" or deceptive stratagems were employed and that Montoya did not react to the questioning with emotional outbreaks. It

---

[38] *Hernandez, supra* note 37.

[39] *Id.*

[40] *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010).

[41] See, *State v. Turner*, 288 Neb. 249, 847 N.W.2d 69 (2014); *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

[42] *McClain, supra* note 41.

[43] See *id.*

found that Bauermeister made no threats or promises during the interview and maintained a serious and calm tone throughout. These findings are supported by the record and are not clearly erroneous.

Based on these factual findings and our de novo review of the record, including the video recording of the second interview, we conclude the statements Montoya made during the second interview were voluntary and were not the result of police coercion. There was no error in overruling the motion to suppress as to the second interview.

### (ii) Third Interview

Montoya argues her statements in the third interview were not voluntary, because improper inducements were made to her by police in the form of either promises of leniency or threats of harsher punishment. Some additional factual background is necessary to understand her arguments.

Before questioning Montoya, Bauermeister spoke at length about the importance of telling the truth during the interview, saying, "Whatever you do today though, don't lie about it, because if you lie about anything or fail to tell me anything, it's going to look really bad for you when you go to court." Bauermeister went on to say:

> You can choose not to talk to me and that's fine, but the story I got, and the injuries [C.H.] has, I can prove that you had something to do with this. I can prove you are responsible for this at this point. Now, if you go into court, and you will go to court for this at some point . . . . If you go into court, if you stand up there on the stand and you say anything that is a lie and I get up there on the stand and say that this is what she told me and this is a lie and I can prove it because of this, this, and this, that's going to make you look very bad to a judge or a jury. So right now what you need to think about is getting the truth out and explaining what happened. . . . Don't you think that whoever listens to this story, that I'm gonna tell and the prosecutor's gonna tell, and we lay out

the facts of the case, don't you think they would rather hear, would like to hear and don't you think that they would want to work with the person who says I made a mistake as opposed to the person who just flat out lies or the person who says no I didn't make a mistake, I'm a bad, evil person and I wanted to hurt that child so bad that the child might die. I'll guarantee you that it would sound better if it's just some deal where you just couldn't take it anymore. . . . I would rather have somebody say "I made a horrible mistake" and tell me the entire truth about what happened as opposed to having someone just lie to me, and then later on I will prove that those are lies. Don't you think the person who lies is going to be treated . . . I don't want to say more harshly, but who would you want to work with?

Bauermeister then advised Montoya of her *Miranda* rights and began questioning her. Throughout the interview, Bauermeister continued to emphasize the importance of being truthful. He told Montoya he did not think she was being completely honest, and he commented that judges and juries do not like liars, that it would be better for Montoya to tell the truth, and that prosecutors and police would be more likely to "work" with someone who was truthful.

[14] While the confession of an accused may be involuntary and inadmissible if obtained in exchange for a promise of leniency, mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or promise, does not make a subsequent confession involuntary.[44] In order to render a statement involuntary, any benefit offered to a defendant must be definite and must overbear his or her free will.[45]

The district court found that Bauermeister's statements during the third interview did not rise to the level of promises

---

[44] See *id.*

[45] *Id.*

of leniency or threats of harsher punishment. After reviewing the video recording and considering the totality of the circumstances, we agree. Bauermeister used standard interrogation techniques, and nothing about the circumstances of the interrogation or the characteristics and reaction of Montoya suggest her will was overborne. On this record, we agree with the district court's conclusion that Montoya's statements in the third interview, both oral and written, were voluntarily made. The trial court did not err in overruling Montoya's motion to suppress, and her first assignment of error is without merit.

## 2. Interpreting § 28-707

Several of Montoya's remaining assignments of error rise and fall on the merits of her statutory interpretation argument, so we consider that argument as a threshold matter. Summarized, Montoya argues that to be found guilty of the Class IB felony of intentional child abuse resulting in death under § 28-707(1) and (8), the State was required to prove not only that she knowingly and intentionally committed the crime of child abuse, but also that she intended that abuse to result in the child's death. The trial court rejected Montoya's proposed interpretation of § 28-707, and so do we.

[15] Our analysis begins with the plain language of the statute. Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[46] Section § 28-707 provides in relevant part:

(1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:

(a) Placed in a situation that endangers his or her life or physical or mental health;

(b) Cruelly confined or cruelly punished;

---

[46] *State v. Wal*, 302 Neb. 308, 923 N.W.2d 367 (2019).

(c) Deprived of necessary food, clothing, shelter, or care;

(d) Placed in a situation to be sexually exploited . . . ;

(e) Placed in a situation to be sexually abused . . . ; or

(f) Placed in a situation to be a trafficking victim . . . .

. . . .

(3) Child abuse is a Class I misdemeanor if the offense is committed negligently and does not result in serious bodily injury as defined in section 28-109 or death.

(4) Child abuse is a Class IIIA felony if the offense is committed knowingly and intentionally and does not result in serious bodily injury as defined in section 28-109 or death.

(5) Child abuse is a Class IIIA felony if the offense is committed negligently and results in serious bodily injury as defined in section 28-109.

(6) Child abuse is a Class IIA felony if the offense is committed negligently and results in the death of such child.

(7) Child abuse is a Class II felony if the offense is committed knowingly and intentionally and results in serious bodily injury as defined in such section.

(8) Child abuse is a Class IB felony if the offense is committed knowingly and intentionally and results in the death of such child.

In the present case, the district court found that Montoya committed the offense of child abuse by placing C.H. in a situation that endangered her life, in violation of § 28-707(1)(a), and by cruelly punishing C.H., in violation of § 28-707(1)(b). The court expressly found Montoya committed such child abuse knowingly and intentionally, and not negligently or recklessly.[47] And the court found the child abuse resulted in the death of C.H. and thus was a Class IB felony under § 28-707(8).

---

[47] See § 28-707(9).

Montoya does not take issue with the trial court's conclusion that she knowingly and intentionally committed the offense of child abuse as defined in § 28-707(1)(a) and (b). Instead, she contends that in order to find her guilty of intentional child abuse resulting in death under § 28-707(1) and (8), the trial court also had to find that she had the "intent to commit the harm"[48] or the "intent to commit the result"[49] of the child abuse. In other words, Montoya contends that to be found guilty of knowing and intentional child abuse resulting in death, the State was required to prove not only that she intentionally committed the offense of child abuse, but also that she intended the abuse to result in death. As we explain below, Montoya's construction is inconsistent with the plain language of the statute and is contrary to this court's case law.

[16] Section 28-707(1) defines the offense of child abuse and states that one commits child abuse "if he or she knowingly, intentionally, or negligently causes or permits a minor child to be" abused in any of the six ways identified in subsections (a) through (f). Then, § 28-707(3) through (8) classify the level of any such offense based on two factors: the actor's state of mind when committing the offense and the degree of harm to the child resulting from the offense.[50] But neither the plain language of § 28-707 nor our cases interpreting it require the State to prove the defendant intended the resulting harm to the child. We said so expressly in *State v. Molina*[51] when we observed that "[c]hild abuse resulting in death requires proof of the defendant's intent to commit child abuse, as defined in the subsections of § 28-707(1), but it does not require proof that the defendant intended to kill the minor child."

---

[48] Brief for appellant at 29.

[49] *Id.* at 23.

[50] See *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005).

[51] *Molina, supra* note 3, 271 Neb. at 505-06, 713 N.W.2d at 432.

In *Molina*, the defendant was convicted of both second degree murder and intentional child abuse resulting in death. He appealed, arguing his conviction for second degree murder should be vacated because it was a lesser-included offense of knowing and intentional child abuse resulting in death. We applied the *Blockburger*[52] test and disagreed. First, we observed that intentional child abuse resulting in death requires proof that the death was that of a minor child, which is not required to prove second degree murder. We then stated:

> [S]econd degree murder also requires proof of an element that child abuse resulting in death does not: an intent to kill. . . . *Child abuse resulting in death requires proof of the defendant's intent to commit child abuse, as defined in the subsections of § 28-707(1), but it does not require proof that the defendant intended to kill the minor child.* Second degree murder, on the other hand, requires proof of an intent to kill.[53]

*Molina* therefore held that second degree murder was not a lesser-included offense of intentional child abuse resulting in death.

Our opinion in *State v. Muro*[54] is also instructive. In that case, we explained that under the statutory framework of § 28-707, the proscribed conduct is "exactly the same" whether the offense is classified as a felony or a misdemeanor,[55] but that the classification of the offense will vary depending on two factors: the defendant's state of mind in committing the offense and the degree of harm caused by the offense. In *Muro*, the defendant left her infant in the care of another and,

---

[52] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932) (requiring analysis of whether each statute requires proof of fact which other does not).

[53] *Molina, supra* note 3, 271 Neb. at 505-06, 713 N.W.2d at 432 (emphasis supplied).

[54] *Muro, supra* note 50.

[55] *Id.* at 708, 695 N.W.2d at 429.

after returning home, she found the child was unresponsive and "'limp, kind of like a rag doll.'"[56] The defendant waited approximately 4 hours before seeking medical care for the child. By the time the child arrived at a hospital, she was not breathing, her pupils were fixed and dilated, and she was limp and cold. Tests eventually concluded brain death had occurred, and the decision was made to discontinue life support. An autopsy showed the cause of death was a skull fracture that resulted in cerebral edema and ultimately brain death. The defendant was convicted of intentional child abuse resulting in death, a Class IB felony, and sentenced to 20 years' imprisonment.

We confirmed the conviction for child abuse, reasoning the evidence supported a finding that the defendant knowingly and intentionally caused or permitted her child to be deprived of necessary medical care, in violation of § 28-707(1)(c). But for purposes of classifying the crime, we found the medical evidence was insufficient as a matter of law to establish beyond a reasonable doubt that the child's death was proximately caused by the delay in seeking medical care. Notably, we explained that the State's failure to prove that the child's death resulted from the abuse "d[id] not relieve [the defendant] of criminal responsibility"[57] for the offense of child abuse, but affected only the level of the offense under § 28-707. We thus concluded the evidence was "sufficient to sustain a conviction for Class IIIA felony child abuse under § 28-707(4) without any proof of resulting harm to the child."[58] So, we reclassified the offense from a Class IB felony to a Class IIIA felony and remanded the matter for resentencing. *Muro* illustrates that proof of the resulting harm is pertinent to classifying the offense of child abuse, but it does not impact criminal responsibility for the offense.

---

[56] *Id.* at 705, 695 N.W.2d at 427.

[57] *Id.* at 713, 695 N.W.2d at 432.

[58] *Id.* at 713-14, 695 N.W.2d at 432.

[17] Given the plain language of § 28-707 and our cases interpreting and applying it, we reject Montoya's contention that the intent to cause the resulting harm is a necessary element of the offense of child abuse. We hold that to convict a defendant of the Class IB felony of knowing and intentional child abuse resulting in death under § 28-707, the State must prove the defendant knowingly and intentionally caused or permitted the child to be abused in one or more of the ways defined in § 28-707(1), and also must prove the offense resulted in the child's death, as required by § 28-707(8). It is not necessary, however, to prove the defendant intended the abuse to result in the child's death.[59]

[18] In arguing for a contrary interpretation, Montoya presents a number of different arguments which invite this court to ignore the statutory requirements established by the Legislature, to conflate the statutory provisions defining the offense of child abuse[60] with the statutory provisions classifying the level of offense for purposes of punishment,[61] and to read provisions into the statutory language which are not there. But it is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.[62] It would add nothing to our jurisprudence to address all of Montoya's arguments individually. We have considered them all and find, without exception, that they either are premised on a fundamentally flawed reading of the statute or urge a construction which is contrary to the plain and unambiguous language of § 28-707 and this court's opinions construing it.

Having addressed the proper interpretation of § 28-707 as a threshold matter, we apply that interpretation when considering Montoya's remaining assignments of error.

---

[59] *Molina, supra* note 3.

[60] See § 28-707(1).

[61] See § 28-707(3) through (8).

[62] *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019).

### 3. Plea in Abatement and
### Sufficiency of Evidence

[19] Montoya's second assignment of error challenges the denial of her plea in abatement and argues the evidence offered at her preliminary hearing was insufficient to bind the case over. Her fourth assignment of error argues that the State's evidence at trial was insufficient to convict her of intentional child abuse resulting in death. We address these assignments together, because we have held that "an error in a ruling on a plea in abatement challenging whether there was sufficient evidence to bind a case over for trial is cured by a subsequent finding at trial of guilt beyond a reasonable doubt which is supported by sufficient evidence."[63] Consequently, Montoya's second and fourth assignments both turn on whether the evidence at trial was sufficient to convict her of intentional child abuse resulting in death.

[20] When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[64] The evidence that Montoya knowingly and intentionally committed child abuse was overwhelming.

Montoya admitted that on March 12, 2016, she threw C.H. against the bed multiple times causing her to hit her head on the wall and the bedframe. She admitted slamming C.H.'s head into the wall and pressing C.H. against the wall so hard she thought the child's ribs would break. By the time Montoya took C.H. to the hospital some 13 hours later, C.H. was unresponsive, tremoring, and posturing and had bruising all over her body. Imaging revealed a skull fracture and bleeding in the brain, and medical evidence showed the cause

---

[63] *State v. Chauncey*, 295 Neb. 453, 464, 890 N.W.2d 453, 462 (2017).

[64] *State v. Draper*, 295 Neb. 88, 886 N.W.2d 266 (2016).

of C.H.'s death was blunt force trauma to the head. This evidence was sufficient to prove that Montoya knowingly and intentionally caused C.H. to be placed in a situation that endangered her life or physical or mental health, in violation of § 28-707(1)(a), and knowingly and intentionally caused C.H. to be cruelly punished, in violation of § 28-707(1)(b). The evidence was also sufficient to prove that Montoya's offense resulted in C.H.'s death, making it a Class IB felony under § 28-707(8).

Montoya does not challenge any of this evidence, but instead argues the State offered no evidence that she intended to kill C.H. She points specifically to her own statement that she never intended to kill C.H. and to the investigating officer's testimony that he "uncovered no evidence suggesting that . . . Montoya intended to cause the death of [C.H.]." But since intent to cause death is neither an element of the offense of child abuse nor a factor in determining the level of such offense, Montoya's argument in that regard is simply immaterial. The evidence at trial was sufficient to support Montoya's conviction for intentional child abuse resulting in death, and her arguments to the contrary are meritless.

### 4. CONSTITUTIONALITY OF § 28-707

In her third assignment of error, Montoya argues the district court erred in overruling her motion to quash the information and rejecting her constitutional challenges to § 28-707. Montoya's motion to quash alleged that § 28-707(1), (3), (6), and (8) violate equal protection, violate due process, and are unconstitutionally vague and overbroad both facially and as applied.

[21,22] As a preliminary matter, we point out that Montoya was convicted of child abuse under § 28-707(1)(a) and (b) and (8), but her constitutional challenge purports to extend to other portions of the statute as well. Standing to challenge the constitutionality of a statute under the federal or state Constitution depends upon whether one is, or is about to be, adversely

affected by the language in question.[65] To establish standing, the contestant must show that as a consequence of the alleged unconstitutionality, the contestant is, or is about to be, deprived of a protected right.[66] Courts will not decide a question concerning the constitutionality of a statute unless such question has been raised by a litigant whose interests are adversely affected by the questioned statute.[67]

Montoya can claim to be adversely affected only by the statutory provisions under which she was charged and convicted, and we conclude she lacks standing to challenge other portions of § 28-707. Furthermore, we limit our analysis to only those constitutional arguments specifically discussed in Montoya's appellate briefing.[68]

Montoya's appellate briefing focuses on just two of the constitutional claims alleged in her motion to quash. Her primary argument is that § 28-707 violates equal protection principles, because it "criminalizes the same conduct [but] imposes substantially different penalties for that conduct"[69] depending on how the crime is classified. She also argues that § 28-707 is unconstitutionally vague.

[23-25] In considering these two constitutional challenges, we presume § 28-707 to be constitutional and resolve all reasonable doubts in favor of its constitutionality.[70] The burden to clearly demonstrate that a statute is unconstitutional rests upon the party making the claim of unconstitutionality.[71] A

---

[65] *State v. Hibler*, 302 Neb. 325, 923 N.W.2d 398 (2019).

[66] *Id.*

[67] *State v. Crowdell*, 234 Neb. 469, 451 N.W.2d 695 (1990).

[68] See *In re Estate of Graham*, 301 Neb. 594, 919 N.W.2d 714 (2018) (absent plain error, appellate court considers only those claimed errors specifically assigned and argued).

[69] Brief for appellant at 26.

[70] See *State v. Rung*, 278 Neb. 855, 774 N.W.2d 621 (2009).

[71] *State v. Carpenter*, 250 Neb. 427, 551 N.W.2d 518 (1996).

penal statute must be construed so as to meet constitutional requirements if such can reasonably be done.[72] Applying these principles, we address both of Montoya's constitutional arguments in turn.

### (a) Equal Protection Claim

Montoya argues that under § 28-707, "[t]he penalties are disparate" but "the same conduct is at issue," and she contends that this violates her "right to equal protection under Article I, Section 3 of the Nebraska Constitution and the 14th Amendment to the U.S. Constitution."[73] We have recognized that the Nebraska Constitution and the U.S. Constitution have identical requirements for equal protection challenges,[74] so we address her claims together.

Montoya's equal protection claim is best understood as a challenge to the different classifications or gradations of offense under § 28-707. She generally argues, through a series of hypotheticals, that her criminal conduct was charged as a Class IB felony, yet someone else committing the same acts of abuse might be charged with and convicted of a lower level felony, or even a misdemeanor. She contends this shows a violation of equal protection. We disagree.

As explained earlier, § 28-707 differentiates between levels of offense based on two factors: the actor's state of mind in committing the proscribed conduct and the degree of harm resulting to the child. Generally speaking, those who commit child abuse knowingly and intentionally are subject to a higher penalty range than those who commit the crime negligently; and, as the degree of harm caused to the child increases, so does the penalty range. As a result, depending on the actor's state of mind in committing the offense and the harm caused to the child, the same criminal conduct can be classified as either

---

[72] *Id.*

[73] Brief for appellant at 27.

[74] *Hibler, supra* note 65.

a Class I misdemeanor,[75] a Class IIIA felony,[76] a Class IIA felony,[77] a Class II felony,[78] or a Class IB felony.[79]

Montoya suggests that these classifications offend equal protection principles. She suggests the only way to classify her offense as a Class IB felony without offending equal protection is to read into the statute an "intent to kill" requirement. There are two problems with her argument: We have already rejected her statutory interpretation as unsound, and she has not presented any argument showing how the classification of crimes under § 28-707 violates the Equal Protection Clause.

[26,27] The Equal Protection Clause does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.[80] When a classification created by state action does not jeopardize the exercise of a fundamental right or categorize because of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.[81] Montoya does not claim that the classification of her crime as a Class IB felony turns on a suspect characterization or affects a fundamental right, and we have been clear that child abuse is not a constitutionally protected activity.[82] Accordingly, Montoya's equal protection claim is subject to rational basis review.

[28,29] Under rational basis review, we will uphold a classification created by the Legislature where it has a rational

---

[75] § 28-707(3).

[76] § 28-707(4) and (5).

[77] § 28-707(6).

[78] § 28-707(7).

[79] § 28-707(8).

[80] *Hibler, supra* note 65.

[81] *Id.*

[82] *State v. Sinica*, 220 Neb. 792, 372 N.W.2d 445 (1985).

means of promoting a legitimate government interest or purpose.[83] In other words, the difference in classification need only bear some relevance to the purpose for which the difference is made.[84] Under the rational basis test, whether an equal protection claim challenges a statute or some other government act or decision, the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.[85] Montoya has failed to meet this burden.

As it regards her equal protection claim, Montoya's briefing does little more than point out that § 28-707 proscribes the same criminal conduct but classifies the level of crime differently depending on certain statutory factors. She does not mention or discuss the rational basis test or attempt to apply any other level of constitutional scrutiny to the classification she challenges. She does not argue, or even imply, that classifying the crime of child abuse as a Class IB felony when it is committed intentionally rather than negligently, and when it results in the death of the child, somehow fails to rationally further a legitimate state interest.

In short, Montoya has failed to present any viable equal protection argument related to the classification of her crime under § 28-707(8). The district court did not err in rejecting her equal protection claim.

### (b) Void for Vagueness

Montoya's motion to quash alleged that § 28-707 was both "overbroad and vague" and thus facially invalid. But on appeal, she argues only that the statute should be found "facially unconstitutional as violative of the void-for-vagueness doctrine,"[86] so we confine our analysis accordingly.

---

[83] *Rung, supra* note 70.

[84] *Id.*

[85] *Id.* See, also, *Hibler, supra* note 65.

[86] Reply brief for appellant at 3.

[30,31] The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.[87] The test for standing to assert a vagueness challenge is the same whether the challenge asserted is facial or as applied.[88] Courts consider two things: First, to assert a claim of vagueness, a defendant must not have engaged in conduct which is clearly prohibited by the questioned statute.[89] Furthermore, a defendant cannot maintain that the statute is vague when applied to the conduct of others, because a court will not examine the vagueness of the law as it might apply to the conduct of persons not before the court.[90] Montoya fails the test for standing under both considerations.

Montoya engaged in conduct that is clearly proscribed by § 28-707 when she abused C.H., and thus lacks standing to assert a claim of vagueness.[91] She was convicted of violating § 28-707(1)(a) and (b), and this court has previously upheld both those statutory provisions against challenges that the conduct proscribed therein is unconstitutionally vague or overbroad.[92]

Additionally, the real focus of Montoya's vagueness argument is not on her crime at all. Instead, she focuses on the different criminal classifications of the crime under § 28-707 and argues the classifications are potentially vague as applied to the conduct of others:

Is the situation where a child dies in an accident where the defendant was speeding a Class IB, a Class IIA, or a

---

[87] *Scott, supra* note 10; *Rung, supra* note 70.

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] See *id.*

[92] See, *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002); *Crowdell, supra* note 67; *Sinica, supra* note 82.

Class I misdemeanor? Is a shaken-baby case a Class IB Felony or a Class IIA Felony? Is the case where the child is inadvertently scalded in too hot bath water a Class IIA Felony or a Class I misdemeanor? Is a case where very young children are left at home and a fire ensues a Class IIA Felony or a Class I misdemeanor? The examples are endless.[93]

We conclude that Montoya lacks standing to assert a claim that § 28-707 is void for vagueness, because she was engaging in conduct that is clearly proscribed by § 28-707(1)(a) and (b) when she abused C.H. Furthermore, she lacks standing to assert a claim of vagueness on behalf of others. Montoya's third assignment of error has no merit.

## 5. Excessive Sentence

[32,33] In her final assignment of error, Montoya challenges her sentence as excessive. She was convicted of a Class IB felony, which is punishable by a minimum of 20 years' imprisonment and a maximum of life imprisonment.[94] Montoya was sentenced to a term of 55 to 75 years in prison. Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits.[95] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[96]

[34-36] Where, as here, a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the

---

[93] Reply brief for appellant at 7-8.

[94] Neb. Rev. Stat. § 28-105 (Supp. 2015).

[95] *Leahy, supra* note 14.

[96] *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

sentence to be imposed.[97] In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[98] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[99]

The record on appeal demonstrates that the trial court considered all of these factors when imposing sentence in this case. Montoya nevertheless presents two arguments in support of her claim that the sentencing court abused its discretion.

First, she argues that during sentencing, the trial court improperly considered the State's suggestion that a delay in providing medical treatment to C.H. was a factor weighing in favor of a harsher sentence. Montoya contends this was improper because there was no evidence that if she had sought treatment more promptly, C.H.'s injuries would have been reduced. But when imposing sentence, the trial judge expressly told Montoya: "I'm not sentencing you because of the delay. Could [earlier treatment] have helped? Nobody will ever know. The doctors evidently don't seem to think so." The record on appeal affirmatively refutes Montoya's contention that the trial court improperly considered the delay in treatment when imposing sentence.

Next, Montoya argues the sentence imposed was excessive when compared to sentences imposed in other cases which defense counsel brought to the trial court's attention during sentencing. Montoya suggests this was an abuse of

---

[97] *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

[98] *Id.*

[99] *Id.*

discretion, but the record affirmatively refutes such a conclusion. Regarding the other cases that defense counsel mentioned during sentencing, the trial judge remarked:

I am aware of the cases . . . which you spoke of, [defense counsel]. I'm also aware of a lot of other cases that you did not speak of that I researched and looked into and that were sentenced significantly greater than what you indicated.

. . . The law is different in some instances. Injuries are different, circumstances are different.

Montoya's sentence is well within the statutory limits and reflects the serious nature of her crime. The district court properly considered and applied the relevant factors in determining an appropriate sentence, and we find no abuse of discretion in the sentence imposed.

## V. CONCLUSION

Having found no merit to any of Montoya's assignments of error, we affirm the judgment of the district court.

Affirmed.