Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/04/2025 09:10 AM CST

State of Nebraska, appellee, v.
Crystal L. Demers, also known as
Crystal L. Woods, appellant.

___ N.W.3d ___

Filed February 4, 2025.    No. A-23-622.

1. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, the appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which the appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.

3. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** Under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement after a person has been taken into custody or is otherwise deprived of his or her freedom of action in any significant way.

4. **Miranda Rights.** The ultimate inquiry for determining whether a person is "in custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

5. **Self-Incrimination: Right to Counsel.** If the suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.

6. **Criminal Law: Self-Incrimination: Appeal and Error.** In considering whether a suspect has clearly invoked the right to remain silent, an appellate court reviews not only the words of the criminal defendant, but also the context of the invocation.

7. **Constitutional Law: Confessions.** Volunteered statements of any kind are not barred by the Fifth Amendment, and their admissibility is not affected by the holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

8. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

9. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.

Appeal from the District Court for Lancaster County: Kevin R. McManaman, Judge. Reversed and remanded for a new trial.

Kristi J. Egger, Lancaster County Public Defender, and David J. Tarrell for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

Riedmann, Chief Judge, and Moore and Bishop, Judges.

Per Curiam.

## I. INTRODUCTION

Crystal L. Demers, also known as Crystal L. Woods, appeals her convictions following a stipulated bench trial in the district court for Lancaster County of one count of first degree assault and one count of child abuse resulting in serious bodily injury. On appeal, she argues the court erred in denying her motion to suppress. For the reasons set forth herein, we reverse the convictions and remand the cause to the district court.

## II. STATEMENT OF FACTS

In the early hours of March 4, 2021, Demers brought a 10-month-old baby, who was in her care but was not her biological child, to the emergency room of a hospital in Lincoln, Nebraska. The baby was then transported by helicopter to a hospital in Omaha, Nebraska, where she received emergency brain surgery as the result of an injury to her head. Demers was transported to Lincoln Police Department (LPD) headquarters for an interview with law enforcement. This case arises out of statements made by Demers during that interview.

On April 2, 2021, Demers was charged by complaint in the county court with one count of first degree assault, in violation of Neb. Rev. Stat. § 28-308 (Reissue 2016), a Class II felony, and one count of child abuse resulting in serious bodily injury, in violation of Neb. Rev. Stat. § 28-707(1) and (7) (Cum. Supp. 2024), a Class II felony. The case was subsequently bound over to district court where Demers was charged by information with identical counts.

On May 12, 2022, Demers filed a motion to suppress any statements gathered by law enforcement officers as a result of the interview on March 4, 2021. The motion alleged that she made incriminating statements to law enforcement during the interview but any statements she made were not knowingly, intelligently, or voluntarily given and were therefore made in violation of her 5th, 6th, and 14th Amendment rights.

A hearing on Demers' motion to suppress was held on May 25, 2022. Testimony was heard from five LPD officers who had contact with Demers on March 4, 2021.

A former LPD officer, Curtis Bussard, testified that on March 4, 2021, he was already at the Lincoln hospital responding to another call when he observed a baby being brought into the emergency room. He came into contact with Demers in a side room of the hospital at approximately 2 a.m. Hospital staff informed Bussard that the baby had significant injuries.

Bussard testified that at the time he had contact with Demers, she was not under arrest, but neither was Demers

free to go "due to the investigation." Bussard did not provide Demers a *Miranda* warning, as the purpose of his contact with Demers was to gather background information and preliminary knowledge regarding the events leading up to the baby's injuries. Bussard spoke with Demers on March 4, 2021, on two occasions for approximately 20 minutes each. Bussard testified that he did not threaten or make promises in order to get Demers to speak to him. According to Bussard, Demers' contact with him was cooperative and voluntary, as Demers did not ask Bussard to stop talking to her or to let her leave.

Sgt. Trent Petersen testified he was notified by Bussard on March 4, 2021, that Bussard was starting the initial steps of an investigation. Petersen reported to the hospital at approximately 2:54 a.m. as a supervising officer. He was briefed by the baby's medical team as to her condition, which was critical and potentially fatal.

Petersen first came into contact with Demers at the hospital to inform her that the baby was stabilized and was being transported for surgery. Petersen's body camera footage shows Demers' asking Petersen if she can accompany the baby into her medical procedure; Demers' asking later, "Can I go?"; and Petersen responding, "Sure." Demers made no move to exit the hospital room where she was speaking with Petersen and continued to offer information. Petersen asked Demers if she would be willing to come down to LPD headquarters and give a formal statement. Petersen's body camera footage shows Demers nodding her head up and down, indicating yes. Petersen assured Demers that she was not under arrest and told Demers that she would be given a ride home after the interview was complete. Petersen also instructed that Demers' cell phone be taken from her by LPD in order to preserve potential evidence.

Officer Payton Egger testified that she was tasked by Petersen with transporting Demers from the hospital to LPD headquarters. She made contact with Demers at approximately 3:43 a.m. Egger had been told that Demers was not under

arrest and advised Demers of the same. Egger's body camera footage shows Demers' smoking a cigarette outside of the hospital and then getting into the back of Egger's police cruiser.

Egger's body camera footage also shows that while Demers was in the back of Egger's cruiser, another officer approached and asked Demers for the keys to her car so that he could retrieve a coat for Demers' roommate, who had accompanied Demers to the emergency room with the baby. Demers agreed, and the officer said that he would bring the keys to LPD headquarters shortly.

Egger testified that when she and Demers arrived at LPD headquarters, Egger placed Demers in an interview room. While in the interview room, Demers asked to call her brother, to which Egger responded, "'We're not going to do that right now.'" Egger said that her denial of the phone call came from her understanding that Demers did not have her cell phone with her, and Egger did not have a phone to give her.

Egger's contact with Demers lasted approximately 30 minutes, during which Demers remained cooperative. Egger did not provide Demers with a *Miranda* warning and testified that she did not question Demers at any time to elicit incriminating information, and Demers did not make any statements that Egger would characterize as incriminating.

Petersen arrived back at LPD headquarters and began his interview with Demers at 4:45 a.m. Petersen testified that the door to Demers' interview room was unlocked, he told Demers she was going home "that night," and the decision had been made that Demers was not going to be arrested regardless of what she disclosed to officers.

Petersen testified that he did not provide Demers a *Miranda* warning because LPD wanted Demers to provide information regarding the events leading up to her bringing the baby to the emergency room and because Demers was not under arrest. At that point in the investigation, Petersen did not know whether Demers was a witness or a suspect.

During the interview, Demers asked where her phone and keys were and Petersen responded that he would see which officer had the items. Later, Demers told Petersen that she needed her keys and Petersen responded that he had them, to which Demers said, "Okay." Demers also asked to call her brother, which request Petersen denied. Petersen testified that at that time, LPD was already at Demers' home to make contact with her family members and had ensured that Demers' children were safe. Petersen was also concerned that Demers would delete evidence from her cell phone if she was permitted to use it to make a call to her brother.

Demers later consented to a review of the contents of her cell phone. Video footage from the interview room demonstrates that Petersen asked Demers for consent to search her cell phone and told Demers that her giving consent was the "fastest way for me to get your phone back to you." Demers responded, "I don't care" and to "[g]o right ahead."

Additionally, during Petersen's interview of Demers, she indicated at least four times that she was either tired or wanted a bed. However, at no point during the questioning did she ask Petersen to stop asking her questions, ask to leave, or ask for an attorney. Petersen testified that Demers answered his questions appropriately, voluntarily, and intelligently.

Toward the end of his contact with her, Demers asked Petersen, "So am I going home or no?" Petersen responded, "[T]here's an investigator that specializes in child stuff that's going to come in and talk to you just real quick. Okay?" Demers responded that she was "so tired." A few minutes later, Petersen asked Demers if she needed more water and she responded, "No, I wanna go home." Petersen then said, "Okay, well hold on." Petersen then left and closed the door to the interview room. After Petersen left the room, Demers said, "I gave you my phone. I've been cooperative. . . . I have answered all your questions that I'm answering, and I want to go home."

Petersen testified that he did not gather any incriminating evidence against Demers, but, rather, collected background information from her. He described Demers as cooperative during their contact.

Robert Norton, an investigator with the "Special Victims Unit" of the LPD, was called in to interview Demers on the morning of March 4, 2021. Norton's understanding of Demers' custodial status prior to his interview with her was that Demers had been transported by a uniformed officer from the hospital to LPD headquarters in a cruiser. Demers was not under arrest, and she was to be released following the interview, even if she confessed to a crime.

Norton entered Demers' interview room at approximately 6:23 a.m. At the outset of the interview Demers told Norton that she wanted to "take a nap." Norton told Demers that she was not under arrest and that she was free to leave at any time, to which Demers responded that she was "starting to feel different. They took my phone. . . ."

Norton relayed to Demers numerous times that she was not under arrest. Norton also told Demers that she would be leaving at the conclusion of his interview of her. Demers was never placed in handcuffs, the door to her interview room remained unlocked, and Demers left the room three times, once to use the bathroom and twice to go outside to smoke, although she was escorted on each occasion. Norton described Demers as cooperative during his contact with her. Demers agreed with Norton that she would do everything in her power to help the injured baby, telling him, "That's why I'm still here."

Demers told Norton several times during her interview that she was tired and had been awake for over 48 hours. However, Demers did not fall asleep during her interview and provided appropriate answers to Norton's questions. Demers did not ask Norton to stop asking her questions or for an attorney. At points during the interview, Demers would say that she wanted to go home because of her tiredness, but then would

continue speaking with Norton. Norton denied that Demers had ever demanded to go home during their interview.

At the time Norton was interviewing Demers, she did not have her cell phone, as it had been taken from her at the hospital prior to her being transported to the police station. Subsequently, she consented to a search of it and the forensic extraction process had been initiated. During Demers' interview with Norton, she expressed concern about wanting to get her phone back as soon as possible.

Norton told Demers that it was important the medical professionals treating the injured baby had as much information as possible in order to provide the proper care. Norton began his interview with Demers by collecting personal information about her and how Demers came to be caring for the baby; this portion of the interview lasted for 40 minutes. He then transitioned into asking Demers about how the day of the baby's injuries played out, and Demers began to get emotional when she described driving the baby to the hospital. Norton then exited the interview room to check on the condition of the baby, and Demers began to sob when she was left alone in the interview room.

A few minutes later, 1 hour 10 minutes since the start of his interview with Demers, Norton reentered the interview room and asked Demers about a fall Demers had referenced earlier in their conversation. Demers, now composed, provided Norton with several alternative explanations for the baby's head injury. Initially, she reported that the baby had fallen off of Demers' bed and struck a concrete floor a few days prior. She then stated that one of her children had thrown a metal toy car at the baby's head.

Norton had been told by medical professionals that they believed the baby's injuries were intentional and not accidental, as she had a subdural hematoma. Based on his training, Norton understood the injuries required a significant blunt force trauma or some significant acceleration or deceleration. During his interview with Demers, Norton again emphasized

the importance of telling the truth because "we're not talking about a fall off the bed."

Norton told Demers that he understood she has been under significant personal stress while Demers denied purposefully hurting the baby. Norton and Demers then began speaking over one another, and Demers grew increasingly emotional. Norton told Demers that the baby had suffered a "brunt [sic] force impact" and that though Demers had been acting as a mother for the baby, all "parents can make mistakes." Norton then stressed to Demers that "we need [to] help her quickly" and "we need to . . . know exactly what happened." At this point of the interview, Demers is weeping to the extent that she is unable to answer all of Norton's questions. Norton implored Demers to tell him what happened but remained calm during the interaction and did not raise his voice or otherwise become agitated.

Norton testified that he has received special training in interview techniques to be used when interviewing a party involved in a child abuse case. One of the common tactics is to explain the importance of knowing the truth so that it can be relayed to medical professionals in order for the child to receive the best possible care. Norton testified that he used this interview tactic during his contact with Demers.

Additionally, Norton testified that as Demers was "getting a little closer to what you think might be the real version," he brought his chair around the table in the interview room to sit next to Demers. Norton stated that this was an intentional choice to close the distance between the two of them and that "making it more personal was making it more comfortable for her to talk." In Norton's experience, when an individual hurts a child, they have remorse because they love the child. Norton wanted to show Demers empathy to allow her to make an admission. Video footage of the interview room shows that Norton did not place himself between Demers and the door.

Video footage shows Norton again leaving the interview room and reentering with a doll so that Demers can

demonstrate how the baby's injuries occurred. Demers had told Norton that she had dropped the baby while Demers was running up the stairs and that when the baby fell out of Demers' arms, the baby hit her head on a couch. When Norton reentered the room with the doll, Demers stated, "No, please don't," and continued to cry. However, Demers did immediately act out the incident with the doll once Norton requested that she do so. Again, portions of the video interview are difficult to understand due to Demers' crying.

Norton then told Demers that after speaking with the medical professionals, the baby's injuries could not have been caused by a fall out of Demers' arms and again asked Demers to tell him what happened. Finally, Demers told Norton, "I smack[ed]" her. Norton then suggested that Demers had shaken the baby, which Demers denied but ultimately admitted that she did "smack her in the head." Demers, while continuing to cry, went on to explain that she had slapped the baby and thrown her onto a couch. The baby then flipped off of the couch and fell onto the ground. Demers indicated it was possible that the baby's head hit the window frame above the couch. Demers demonstrated on the doll, and the video recording of the interview shows that Demers forcefully hit both sides of the doll's head and threw her. Norton testified that he felt confident the final version of events provided by Demers was supportive of the significant injuries that the baby had sustained.

Norton also confronted Demers about her earlier explanation for the injuries as being inconsistent with the medical findings. Demers acknowledged that she had lied to Norton about dropping the baby while on the stairs and apologized repeatedly.

Norton then read Demers her *Miranda* rights and had Demers complete a corresponding form where Demers affirmed that she had been given a *Miranda* warning and waived her rights. A copy of the form indicates that it was executed at 9:12 a.m., almost 3 hours into Norton's contact with Demers. The form is signed by both Norton and Demers. Norton denied

using any promises or threats to coerce Demers into waiving her *Miranda* rights.

Norton testified that he "Mirandized" Demers because she had been transported to LPD headquarters in a police cruiser, which is equipped with rear doors that cannot be opened by a passenger themselves. Norton "felt it was necessary for her to be apprised of her rights because she was transported." Additionally, as their "conversation evolved and she became more of a suspect," Norton felt it was necessary to provide Demers with a *Miranda* warning. According to Norton, Demers had begun to incriminate herself prior to being given a *Miranda* warning and, following her waiver, provided more detail into the events that led to the injuries.

During Demers' interview with Norton, she took a break to go outside to smoke. Norton accompanied Demers on her first smoke break because LPD headquarters is a locked facility and Norton wanted to make sure Demers could reenter the building. Demers did not object to Norton's accompanying her on the break. After her smoke break, Demers reentered the building and continued with her interview.

Roughly 5 hours after she had been placed in the interview room at LPD headquarters, Demers told Norton, "I'm done." Norton then asked Demers, "[W]here can I take you to?" Demers asked for another break outside. Frank Foster, another investigator with LPD's "Special Victims Unit," testified that Norton requested that Foster take Demers outside for a smoke break. Foster was with Demers for 5 to 10 minutes during her smoke break. During her second smoke break, Demers continued to talk about the case and Foster asked her some followup questions because "I figured since she's talking about the case, I might as well talk about the case with her."

Foster's pocket digital recorder was used to record Norton's taking Demers on her first smoke break and Foster's taking Demers on her second. Foster testified that a digital recorder was used because he was not equipped with a body camera. The transcript of Demers' conversation with Foster during the

second smoke break indicates that she repeatedly requested her phone and keys be returned to her. Later in their conversation, Foster asked Demers, "Were you able to keep your house warm when that cold streak came through?" And Demers responded, "Yeah. . . . I should have said no, and not kept the baby. Knowing I was already at my limit. . . . I didn't mean to hit her hard . . . ." The two briefly discussed the events leading up to the baby's injuries before Demers finished smoking and the two went back inside LPD headquarters.

When Demers and Foster reentered the interview room, Demers again asked for her phone and keys. Demers told Foster that she was tired of being in the interview room, and Foster offered to take Demers to wait in the lobby; Demers agreed. Norton then reentered the interview room and made arrangements for Demers to be transported back to her car in the hospital parking lot. Norton told Demers, "[Y]ou understand you're free to leave we're just trying to accommodate you."

In addition to the testimony of the five LPD officers, the State offered 11 exhibits into evidence. Exhibits 1 and 2 are body camera videos of Bussard's contact with Demers in the hospital; exhibit 3 is a body camera video of Egger's contact with Demers while transporting her to LPD headquarters; exhibit 4 is a body camera video of Petersen's contact with Demers in the hospital; exhibit 5 is a video of Demers' interview room at LPD headquarters where she was interviewed by both Petersen and Norton; exhibit 6 is a transcript of exhibit 5; exhibit 7 is Demers' *Miranda* warning and waiver form; exhibits 8 and 10 are audio recordings of Norton and Foster accompanying Demers on her smoke breaks; and exhibits 9 and 11 are transcripts of exhibits 8 and 10, respectively.

On November 2, 2022, the district court denied Demers' motion to suppress. The court found that Demers' right against self-incrimination was not violated because she was not in custody at the time of her statements and a reasonable person in Demers' position would have felt free to leave LPD

headquarters. The court further found that Demers did not make an unequivocal invocation of her right to terminate questioning and that her statements to law enforcement were voluntary. The court concluded that because Demers had waived her right to remain silent, statements made by Demers after her *Miranda* warning were admissible.

On December 30, 2022, the State filed an amended information, changing the factual allegations but otherwise charging Demers with identical counts as in the original information.

A stipulated bench trial was held on April 24, 2023. At trial, Demers objected to the admission of her statements contained in any of the jointly offered exhibits based on her motion to suppress.

In an order entered on June 2, 2023, the district court denied Demers' renewed motion to suppress and found Demers guilty of count 1, first degree assault, and count 2, child abuse causing serious bodily injury. Demers was subsequently sentenced to consecutive terms of 22 to 30 years' imprisonment on count 1 and 8 to 20 years' imprisonment on count 2. The court granted Demers credit for 205 days served.

Demers appeals.

## III. ASSIGNMENTS OF ERROR

Demers assigns that the district court erred in denying her motion to suppress because her statements to law enforcement were procured in violation of (1) her right against self-incrimination and (2) her right to due process of law.

## IV. STANDARD OF REVIEW

[1] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, the appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet

the constitutional standards, however, is a question of law, which the appellate court reviews independently of the trial court's determination. *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014).

## V. ANALYSIS

### 1. ALLEGED VIOLATION OF RIGHT AGAINST SELF-INCRIMINATION

Demers assigns that the district court erred in denying her motion to suppress statements she made to law enforcement because these statements were procured in violation of her right against self-incrimination under the 5th and 14th Amendments to the U.S. Constitution and article 1, § 12, of the Nebraska Constitution, and in violation of *Miranda v. Arizona, supra*. Before turning to Demers' various arguments, we set out the governing law.

[2-4] *Miranda v. Arizona, supra*, prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. *State v. Vaughn*, 314 Neb. 167, 989 N.W.2d 378, *cert. denied* ___ U.S. ___, 144 S. Ct. 241, 217 L. Ed. 2d 109 (2023). The safeguards provided by *Miranda* "come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *State v. Vaughn*, 314 Neb. at 182, 989 N.W.2d at 393 (internal quotation marks omitted). Under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement after a person has been taken into custody or is otherwise deprived of his or her freedom of action in any significant way. *Id*. The ultimate inquiry for determining whether a person is "in custody," for purposes of *Miranda*, is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *State v. Vaughn, supra*. The Nebraska appellate courts view these two articulations as synonymous. See *id*. And the fact that a suspect is questioned

by police at the station house does not necessarily render the questioning custodial. See *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019).

The term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. See *State v. Vaughn, supra*.

### (a) Whether Demers Was in Custody

Demers argues that she was in custody when she made incriminating statements, because LPD controlled her ability to move, to contact outside parties, to return to her car, and to operate her car. Additionally, LPD employed interrogation techniques against her designed to elicit incriminating statements. She asserts that a reasonable person in the circumstances Demers was subjected to by LPD would not have felt free to terminate the investigation and leave, because LPD exerted complete control over the space where her questioning occurred and had taken Demers' keys and cell phone. Demers also notes the numerous times she requested a return of her keys and cell phone.

The Nebraska Supreme Court has further set out factors relevant to the custody inquiry: (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to leave; (2) whether the contact with the police was initiated by them or by the person interrogated, and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used

other interrogation techniques to pressure the suspect; and (8) whether the police manifested to the defendant a belief that the defendant was culpable and that they had the evidence to prove it. See *State v. Vaughn, supra*, citing *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

In the district court's order denying Demers' motion to suppress, it found that when taken together, an analysis of the relevant custody factors shows that a reasonable person in Demers' position would have felt free to leave. In our independent review of the underlying facts, we cannot find that the constitutional safeguards required under *Miranda* were afforded to Demers. In our view, Demers was effectively in custody long before she was given the *Miranda* advisement by Norton.

The district court "summarized" the *Rogers* factors. They included (1) the location of the interrogation; (2) whether the police or the defendant initiated the contact; (3) whether the defendant was told he or she was free to leave; (4) whether the defendant's freedom of movement was restricted; (5) the duration of the interrogation; and (6) whether the police were aggressive or confrontational.

However, the extent of the district court's analysis of whether Demers was in custody is as follows:

> [Demers] was asked to give a voluntary statement at the police station, and she agreed. Prior to giving her statement, she was told she was not under arrest at least two times. She was also told she would be given a ride from the police station back home at the end of the interview. Further, at the police station, she was in an interview room with an unlocked door. The interview room was not a secured area, and [Demers] could have left the interview room at any time.
>
> In fact, there were no restrictions on [Demers'] freedom of movement during the interview. She was never physically restrained before, during, or after the interview. She was never placed in handcuffs or told that she

could not leave. [Demers] went outside to smoke a ciga-
rette on at least two occasions during the interview.

Additionally, the questioning of [Demers] was not
aggressive, threatening, or accusatory. The officer's
demeanor during the interview was calm and relaxed, and
the police did not use strong-arm tactics.

The questioning atmosphere was not police-dominated.
[Demers] was not placed under arrest at the conclusion of
the interview. [Demers] freely left the police department
at the conclusion of the interview and was not stopped
from leaving or detained. And there was no coercive
police activity.

Our analysis of the six factors identified by the district
court, however, reveals (1) Demers was interrogated at the
police station, (2) the police initiated the contact, (3) Demers
was told she was free to leave, (4) her freedom of movement
was restricted in that she was placed in an interrogation room
and police accompaniment was required to leave that area,
(5) the interrogation lasted almost 5 hours, and (6) Norton
was confrontational in disputing Demers' initial explanations
of the incident. Based solely on these factors, we conclude
Demers was in custody.

Additionally, when examining the full factors articulated
by the Nebraska Supreme Court in *State v. Rogers, supra*, we
reach the same conclusion. (1) The interview occurred in an
interrogation room at the police station, a place where one
would not normally feel free to leave; (2) the contact with the
police was initiated by them, and Demers voluntarily agreed
to the interview, although as the interview progressed, she
advised she was "feel[ing] different"; (3) Demers was told
she was free to leave at any time, although her requests for
the return of her car keys and cell phone were rebuffed and
at the end of Petersen's interview when Demers asked, "So
am I going home or no?" she was told another investigator
needed to talk with her "real quick"; (4) Demers was placed
in an interrogation room and her ability to leave the room

for smoke breaks and bathroom breaks required accompaniment by officers; (5) no neutral parties were present at any time during the interrogation, and her request to call her brother was denied on at least two occasions; (6) the interrogation lasted almost 5 hours; (7) the police verbally dominated the questioning, and although not aggressive, Norton was confrontational and accusatory, admitting to the use of interrogation techniques to pressure Demers; and (8) Norton manifested to Demers a belief that she was culpable and that he had the evidence to prove it.

This all occurred in the early morning hours after Demers indicated that she had not slept in 48 hours. Demers complained several times about being tired and wanting to go home to sleep or take a nap, and she was very emotional at times.

We note the district court appeared to place great weight on the officers' statements that Demers was not under arrest and was free to leave; however, that is but one of the factors set forth in *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009). *Rogers* instructs that "all of the circumstances" must be examined to determine "whether a reasonable person in the suspect's position would have thought he or she was 'sitting in the interview room as a matter of choice, free to change his [or her] mind and go.'" 277 Neb. at 57, 760 N.W.2d at 54, quoting *Kaupp v. Texas*, 538 U.S. 626, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003). The mere recitation of the statement that the suspect is free to leave or terminate the interview, however, does not render an interrogation noncustodial per se. *U.S. v. Craighead*, 539 F.3d 1073 (9th Cir. 2008). We must consider the delivery of these statements within the context of the scene as a whole. *Id*.

In sum, under the foregoing circumstances, we cannot say that a reasonable person would have felt free to leave during the course of the lengthy interview. Although Demers was not formally arrested, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. See, *California v. Beheler*,

463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (per curiam); *U.S. v. LeBrun*, 363 F.3d 715 (8th Cir. 2004) (en banc). See, also, *U.S. v. Mittel-Carey*, 493 F.3d 36 (1st Cir. 2007) (finding defendant in custody in own home where escorted by agents when permitted to move, including while using bathroom). In light of the officers' other actions, merely giving lip service to Demers' ability to leave does not insulate them from the *Miranda* requirements. "There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." *Hayes v. Florida*, 470 U.S. 811, 815-16, 105 S. Ct. 1643, 84 L. Ed. 2d 705 (1985). We believe that point was reached here.

Further, we are troubled by Norton's explanation about giving Demers the *Miranda* advisement. He first testified that he gave the warning because Demers had been transported to LPD headquarters in a police cruiser that is equipped with rear doors that cannot be opened. Norton also testified that he gave the warning after Demers had become more of a suspect. Under this rationale, Demers was entitled to receive the *Miranda* warning far earlier in the interview process. It was not until Demers told Norton that she had slapped the baby and thrown her onto the couch that Norton provided Demers with the *Miranda* warning out of an abundance of caution.

Because Demers was subject to custodial interrogation, her right against self-incrimination was violated. Thus, we find that Demers' statements made prior to receiving the *Miranda* advisement should have been suppressed.

### (b) Post-*Miranda* Statements

Demers also argues that although she waived her *Miranda* rights, any statements she made after the advisement should also have been suppressed because the "prior, constitutionally infirm questioning tainted the post *Miranda* interview,

rendering it fruit of the poisonous tree." Brief for appellant at 34. We note that Demers does not challenge the validity of her waiver.

After Demers waived her *Miranda* rights, she continued to speak with Norton for approximately 30 minutes and provided more detail into the events that led to the baby's injuries. Specifically, Norton walked Demers back through the timeline of events and asked Demers for additional detail. Demers again demonstrated the level of force and the position of her hands when she struck the baby. She provided more detail regarding the baby's bouncing off the couch and hitting the floor. Demers stated that her hand hurt after smacking the baby, and when asked about the force on a scale of 1 to 10, she said the force she used was close to a 10. Demers denied that the baby had any visible injuries or was acting strangely aside from being lethargic. However, Demers admitted that she was terrified she had hurt the baby because she had smacked the baby's head, she had thrown her, and the baby had hit the floor. Demers stated that she performed an internet search about "what would happen to hit hard surface." Demers provided additional detail about when she realized the baby was injured, around 5 p.m., but noted that she did not take action until her roommate came home hours later. She expressed deep remorse for the baby's injuries.

Approximately 30 minutes after her *Miranda* waiver, Demers told Norton, "I'm done." Norton then made arrangements to transport Demers back to her car at the hospital, and he did not ask her any more questions.

In *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), the U.S. Supreme Court addressed the two-step interrogation technique of (1) giving *Miranda* warnings only after an interrogation has produced a confession and then (2) questioning the suspect so as to cover the same ground a second time, but with *Miranda* warnings in place. A plurality of the Court concluded that "when *Miranda* warnings are inserted in the midst of coordinated

and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to [the defendant's] ability to understand the nature of his [or her] rights and the consequences of abandoning them.'" See *Missouri v. Seibert*, 542 U.S. at 613-14. The plurality explained that when a suspect is advised of his or her *Miranda* rights in the middle of an interrogation, the issue becomes whether the warnings effectively advised that he or she "could choose to stop talking even if he [or she] had talked earlier." *Missouri v. Seibert*, 542 U.S. at 612. Of particular significance to the Court's conclusion that the pre-*Miranda* confession made the later *Miranda* warnings ineffective was the fact that questioning before the *Miranda* warnings was "systematic, exhaustive, and managed with psychological skill" to such an extent that after the unwarned interrogation, "there was little, if anything, of incriminating potential left unsaid." *Missouri v. Seibert*, 542 U.S. at 616.

In *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014), the Nebraska Supreme Court determined that the *Miranda* warning issued during an interrogation, but after incriminating statements had been made, did not invalidate the post-*Miranda* statements, because the initial interrogation consisted of one question that was not focused on the key points of the investigation. In *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017), the Nebraska Supreme Court found that the defendant was questioned for 5 minutes prior to receiving the *Miranda* warning, mostly about background information, and the defendant did not make any incriminating statements; thus, the post-*Miranda* confession was valid. In *State v. Cavitte*, 28 Neb. App. 601, 945 N.W.2d 228 (2020), this court found that because the defendant did not make any incriminating statements to the officer before receiving the *Miranda* warning, her post-*Miranda* statements were admissible. Similarly, in *State v. Williams*, 26 Neb. App. 459, 920 N.W.2d 868 (2018), this court held that the defendant's post-*Miranda* confession was

admissible because his pre-*Miranda* statements did not go to many of the key points of the investigation.

In the instant case, Demers was questioned by Petersen for 1 hour 30 minutes and by Norton for over 3 hours prior to his giving her the *Miranda* warning. The interview during this time went well beyond background information and clearly went to key points of the investigation into how the baby sustained the injuries. Demers made incriminating statements prior to receiving and waiving her *Miranda* rights. The post-*Miranda* questions sought confirmation of, and further detail regarding, Demers' prior confession to assaulting the baby. Under these circumstances, we conclude that giving the *Miranda* warning near the end of the interview was ineffective and that the post-*Miranda* statements should also have been suppressed.

### (c) Statements After Invocation of Right to Terminate Questioning

Demers argues that after her invocation of the right to terminate questioning, she was further interrogated by Foster when he accompanied her on a smoke break. She asserts that when she told Norton that she was "done," all questioning by law enforcement should have ceased.

[5-7] If the suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease. *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014). In considering whether a suspect has clearly invoked the right to remain silent, an appellate court reviews not only the words of the criminal defendant, but also the context of the invocation. *Id*. Volunteered statements of any kind are not barred by the Fifth Amendment, and their admissibility is not affected by the holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *State v. DeJong, supra*.

In *DeJong*, the Nebraska Supreme Court determined that the defendant's statement, "'I'm tired. I wanna go to bed, please. I'm done, I wanna go to sleep. I'm tired,'" to be an

invocation of the defendant's right to remain silent. 287 Neb. at 869, 845 N.W.2d at 865. The Supreme Court found that it had held very similar statements, such as "I'm done," to be unambiguous invocations. *Id*. at 884, 845 N.W.2d at 874 (internal quotation marks omitted). As the district court reasoned in its order denying Demers' motion to suppress, "[a] bare statement of fatigue requires police to guess that what Defendant really means is that she wants to terminate questioning" and "[w]hen ambiguity exists[,] a statement cannot be an unequivocal invocation of a right to cease questioning."

When Demers stated to Norton that she was "done," she effectuated her right to terminate the interrogation. As we indicate above, Norton honored this right and did not question Demers further. Demers then requested to go outside while Norton was arranging for her return to her car. Foster accompanied Demers outside, during which time she made voluntary statements to Foster. Following a discussion about having her phone and keys returned to her, Foster engaged in small talk with Demers, asking where Demers is from, whether she was in the process of moving, and about the weather.

Demers then, unprompted by Foster, began to make statements about hitting the baby. Specifically, Demers told Foster that she should have declined the request to watch the baby, knowing that she was already "at [her] limit." She went on to state that she "didn't mean to hit [the baby] hard, I didn't think I . . . would hurt her." Foster asked Demers how she knew the woman who had taken the baby to Demers' house. Demers responded that she had been taking care of the baby off and on since the baby was 3 days old. Demers then offered that the baby grabbed her chest piercing and that because Demers had already told the baby once to stop, "I smacked her head." Foster asked what happened next, and Demers continued that she then "tossed" the baby onto the couch and that the baby "flipped off." Because these statements were made by Demers voluntarily following her invocation of her right to terminate questioning, they were admissible.

### (d) Conclusion Regarding
### Motion to Suppress

We conclude that Demers was in custody while she was interrogated at the police station. The district court erred in failing to grant Demers' motion to suppress the incriminating statements made by her while she was in custody, both before and after she was given the *Miranda* warnings, and prior to the invocation of her right to terminate questioning. However, because her incriminating statements to Foster were voluntary and not the result of interrogation, those statements were properly admitted. Nevertheless, we cannot find that the admission of the incriminating statements prior to the invocation of her right to remain silent was harmless. We therefore must reverse the convictions.

[8] Having found reversible error, we must determine whether the totality of the evidence admitted by the district court was sufficient to sustain Demers' convictions. If it was not, then concepts of double jeopardy would not allow a remand for a new trial. See, e.g., *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009). The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. *State v. Rogers, supra*. We find that Demers' confession and the circumstantial evidence against her were sufficient to sustain the verdicts. We therefore reverse the convictions and remand the cause for a new trial.

### 2. Remaining Assignment of Error

[9] Demers also assigns that the interrogation by law enforcement violated her right to due process. Given our conclusion that Demers' right against self-incrimination was violated, we need not address this assigned error. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.

## VI. CONCLUSION

The district court erred in denying Demers' motion to suppress to the extent that the court admitted statements made by Demers before she invoked her right to remain silent. Because the evidence presented by the State was sufficient to sustain Demers' convictions, we reverse the convictions and remand the cause for a new trial.

Reversed and remanded for a new trial.

Moore, J., dissenting.

### ALLEGED VIOLATION OF RIGHT AGAINST SELF-INCRIMINATION

I respectfully disagree with the majority's finding that Demers was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and the resulting conclusion that her statements to law enforcement should be suppressed. In my opinion, Demers was not in custody and neither her pre- or post-*Miranda* statements should be suppressed.

The video recordings of Demers' contact with law enforcement throughout the early morning hours of March 4, 2021, show that Demers was willing to go to LPD headquarters and give a formal statement. She voluntarily got into the back of Egger's police cruiser and gave her car keys to another officer before being driven to LPD headquarters. Multiple law enforcement officers throughout their contacts with Demers advised her that she was not under arrest and that regardless of what happened she would be going home at the conclusion of the interview. Norton specifically told Demers that she was free to leave at any time and that the door to the interview room was unlocked. Demers also consented to a search of her cell phone.

Upon my review of Petersen's and Norton's interviews with Demers, I do not find that the officers verbally dominated the interview with Demers or were accusatory, threatening, aggressive, or confrontational. Petersen testified that, at the

time Demers was asked to come to the station to give a formal statement, law enforcement was unsure whether Demers was a witness or a suspect. Petersen collected background information, and through video footage of the interview room, Demers is observed to be conversational and cooperative with Petersen. Petersen's questions did not elicit any incriminating information from Demers.

Norton's tone in his interview of Demers is likewise calm and relaxed. Much of the interview includes rapport building and Norton collecting information regarding the timeline of the baby's injuries. Norton testified that he eventually confronted Demers regarding her previous version of events because he was told by medical professionals that the baby's injuries were more likely intentionally caused. Norton emphasized to Demers the importance of telling the truth so that the hospital could provide the best medical care to the baby, an interview tactic Norton testified is common in cases involving a child victim.

Norton did not raise his voice or manifest to Demers a belief that she was culpable and that LPD had the evidence to prove it. Rather, Norton told Demers that her previous version of events did not match the information provided by medical professionals. At one point, Norton moved physically closer to Demers in the interview room, bringing his chair around the table to sit next to Demers. Norton testified that he did this to show Demers empathy, which would allow her to feel more comfortable. He maintained personal space from Demers and did not block her path to the door of the interview room. Norton acknowledged that he had suggested that Demers had shaken the baby, but that Demers had not admitted to this, instead eventually stating that she had slapped the baby.

Finally, Demers' freedom of movement at LPD headquarters was never restricted. She was never physically restrained before, during, or after the interview. She was never placed in handcuffs or told that she could not leave. Video footage of the interview room shows Demers standing up and walking

around the room at points and once opening the door of the
interview room herself to request a bathroom break. Demers
went outside to smoke a cigarette twice. Norton testified that
the only reason Demers was accompanied whenever she left
the interview room was because LPD headquarters is a secure
facility and that he wanted to facilitate her reentry into the
building. A review of the audio from Foster's pocket recorder
indicates that Demers never objected to being accompanied on
her smoke breaks.

I find the facts of this case to be similar to *State v. Montoya*,
304 Neb. 96, 933 N.W.2d 558 (2019), where a mother was
questioned by police after taking her injured child to the emer-
gency room. During an hour-long interview with police at the
station house, the mother admitted that she repeatedly threw
her child on the bed and that the child struck her head on the
wall the third time she was thrown. The mother was not given
a *Miranda* warning until a subsequent interview the following
day. *State v. Montoya, supra*.

The Nebraska Supreme Court agreed with the trial court's
findings that the mother voluntarily agreed to ride with police
to the station because she did not have a car available. *Id*.
Once the mother was in the interview room, she was expressly
told that she was not in custody, that she was free to leave at
any time, that she was not under arrest, and that she would
be walking out of the police station after the interview. *Id*.
Nothing about the officer's subsequent questioning or conduct
nullified these statements. *Id*.

In addition, the mother was instructed by police how to
leave the police station from the interview room, and during
questioning, police did not position themselves in a way to
prevent her from leaving if she wished. *Id*. The mother was not
handcuffed at any point, and her freedom of movement was
unrestrained. *Id.* Based on these findings, the Supreme Court
concluded that a reasonable person in the mother's position
would not have felt he or she was not at liberty to terminate

the interrogation and leave and that thus, she was not in custody during her interview. *Id*.

Similarly, under the circumstances of this case, I find that Demers was not subject to custodial interrogation on March 4, 2021. I acknowledge that the duration of Demers' stay at the police station was longer than that in *State v. Montoya, supra*; however, viewing the other factors discussed above, I find no error in the district court's determination that Demers was not in custody. *Miranda* protections apply only when a person is both in custody and subject to interrogation. *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014). Though Norton's questioning of Demers did result in Demers' making incriminating statements, she was not in custody and Norton was not required to provide *Miranda* warnings. Because Demers was not in custody, her right against self-incrimination was not violated.

Regarding Demers' statements made following her *Miranda* warning, Norton testified that he read Demers her *Miranda* rights as their "conversation evolved and she became more of a suspect." Demers previously provided Norton with several versions of how the baby's injuries came to be. After Demers told Norton that she had slapped the baby and thrown her onto the couch, Norton felt confident that the final version of events provided by Demers was supportive of the significant injuries that the baby had sustained. At that point, given Demers' increasingly incriminating statements, Norton provided Demers with a *Miranda* warning out of an abundance of caution, and Demers subsequently waived her *Miranda* rights. Demers makes no argument that her *Miranda* waiver was in any way deficient. Thus, I find that the statements made by Demers following her *Miranda* rights waiver were also admissible.

## ALLEGED VIOLATION OF RIGHT
## TO DUE PROCESS OF LAW

Demers next assigns that the district court erred in denying her motion to suppress statements she made to law enforcement because these statements were procured in violation of her right to Due Process of Law under the 5th and 14th

Amendments to the U.S. Constitution, and article 1, § 3, of the Nebraska Constitution. The conclusion that Demers was not in custody when she made incriminating statements means that law enforcement did not violate Demers' right against self-incrimination by failing to give her *Miranda* warnings. But it does not resolve whether Demers' confession was voluntary.

Demers argues that her confession was involuntary as law enforcement exploited her mental impairment. She contends that she told officers several times she was sleep deprived but law enforcement continued their interrogation for hours, gradually increasing its coerciveness over time, taking advantage of her exhaustion and emotionally charged condition. She also argues that officers subjected her "to intense, prolonged and manipulative interrogation tactics that eventually elicited a confession." Brief for appellant at 41.

The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession. *State v. Turner*, 288 Neb. 249, 847 N.W.2d 69 (2014). To overcome a motion to suppress, the prosecution has the burden to prove by a preponderance of the evidence that incriminating statements by the accused were voluntarily given and not the product of coercion. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018).

In making the determination of whether a statement is voluntary, a totality of the circumstances test is applied, and the determination reached by the trial court will not be disturbed on appeal unless clearly wrong. *State v. Connelly*, 307 Neb. 495, 949 N.W.2d 519 (2020). Factors to consider in a totality of the circumstances test include the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his or her will to be easily overborne. See *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009).

In the district court's order denying the motion to suppress, the court found that Demers' statements were voluntarily made. The court stated:

In this case there is no coercive police conduct that would render Defendant's statements involuntary. Police questioning was calm and relaxed. The video shows Defendant was coherent and able to intelligently answer questions. Defendant exhibited no signs of extreme intoxication or mental incapacity. Defendant's statements were made intelligently and voluntarily.

Though Demers argues that her sleep deprivation was exploited by the police, both the Nebraska Supreme Court and the U.S. Supreme Court have held that a defendant's mental condition, by itself and apart from its relation to official coercion, should never dispose of inquiry into constitutional voluntariness. See, *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *State v. Hernandez, supra*. Coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *State v. Hernandez, supra*.

Interrogation necessarily includes elements of psychological pressure which are meant to elicit a confession. See *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013). The question is whether the techniques used are so coercive as to overbear the suspect's will. See *State v. Goodwin, supra*. In this case, Norton testified that the interrogation tactics he used were common in child abuse cases. These tactics involved empathizing with the suspect and explaining the importance of knowing the truth so that it can be relayed to medical professionals in order for the child to receive the best possible care. Norton did not make any threats toward Demers or otherwise make promises in exchange for her cooperation. Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or promise, does not make a subsequent confession involuntary. *State v. Goodwin, supra*.

Upon my review of the record, including the video recording of the interview room, I do not find that Norton participated in coercive police activity. The video shows that Norton was calm and relaxed during his interrogation of Demers.

Norton focused on building rapport with Demers and appealing to her better instincts, such as a belief in the importance of telling the truth. Norton did not raise his voice, nor did he have an aggressive demeanor. Demers also was not interrogated by more than one officer at a time.

Further, Demers was explicitly told that she was not under arrest, and Norton advised her that she was free to leave. Though she told Norton that she had been awake for the previous 48 hours, Norton testified that Demers did not fall asleep during her interview and provided appropriate answers to Norton's questions. At points of the interview, Demers would say that she wanted to go home because of her tiredness, but then would continue speaking with Norton. The Nebraska Supreme has rejected the claim that within limits, lack of sleep makes a confession involuntary. See *State v. Ray*, 266 Neb. 659, 668 N.W.2d 52 (2003), citing *State v. Prim*, 201 Neb. 279, 267 N.W.2d 193 (1978).

In *Ray*, the juvenile defendant was taken into custody in the evening hours and was detained for 4 hours "'in solitary'" before the police began their interrogation, without any effort to contact the defendant's parents. 266 Neb. at 666, 266 N.W.2d at 58. The defendant was thereafter given his *Miranda* rights, and the interrogation continued for some time during which the defendant made incriminating statements and gave a recorded confession. The Nebraska Supreme Court found that in the context of the postconviction proceedings, trial counsel was not ineffective, as counsel had brought these facts to the attention of the trial court, which found the defendant's confession to be voluntary.

I acknowledge that Demers was subjected to an interrogation by Norton that was over 3 hours long. However, while discussing a 3-hour-long police interrogation, the U.S. Supreme Court found that "there is no authority for the proposition that an interrogation of this length is inherently coercive." *Berghuis v. Thompkins*, 560 U.S. 370, 387, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). The Court went on to

note that even where interrogations of greater duration were held to be improper, they were accompanied by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats. See *id*. Though Demers was sleep deprived before arriving at LPD headquarters and became emotional throughout various points of the interrogation, I cannot say that there was coercive police activity such that Demers' will was overborne. See *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

Upon my review of the record, I cannot say the district court's finding that Demers' statements were voluntary was clearly erroneous. Demers voluntarily went to LPD headquarters to make a formal statement and then voluntarily continued her interview with Norton for several hours. The statements Demers made in her interview were voluntary and not the result of police coercion. Thus, I would find that Demers' due process rights were not violated.